IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 2:15-cr-511-KKD-GMB |
| | ) | |
| SCOTTIE JEROMA GROCE | ) | |

**REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

Pending before the court is Defendant Scottie Jeroma Groce's Motion to Suppress (Doc. 54). The court held an evidentiary hearing regarding the motion on June 8, 2016, and has reviewed both the Government's response to the motion (Doc. 120) and Groce's reply in support (Doc. 122). For the reasons stated herein, the Magistrate Judge RECOMMENDS that the Motion to Suppress (Doc. 54) be GRANTED in part and DENIED in part, as set forth below.

## I. Background

Groce was indicted along with two co-defendants, Kevin Lavarius Martin and Tremane Darnell Carthen, for various charges stemming from a series of armed convenience store robberies that occurred between July 4, 2014 and July 14, 2014 in Autauga and Elmore Counties. Doc. 4. Physical evidence from one of the robbery scenes connected Groce to the crime, and members of the Autauga County Sheriff's Office ("ACSO") arrested him on July 21, 2014 at Daehan Solutions, his place of employment. Transcript of June 8, 2016 Hearing (Doc. 106) ("Tr.") at 15 & 30; Defendant's Exhibit to June 8, 2016 Hearing ("Def. Ex.") 11 at 22. At that time, ACSO deputies impounded Groce's Lincoln Town Car and transported it from the parking lot at

Daehan Solutions to the ACSO. Tr. at 15.    At some later time, they searched the vehicle.
Tr. at 15–16.

Once in custody, officers transported Groce to the ACSO to interview him. Tr. at
14–17.    ACSO Captain Jim Steele conducted the interview, which was video-recorded
and began at 1:17:48 P.M.[1]  Government's Exhibit to June 8, 2016 Hearing ("Gov't Ex.")
1 (DVD of Groce Interview).    Captain Steele advised Groce of his rights pursuant to
*Miranda v. Arizona*, 384 U.S. 436 (1966). Gov't Ex. 1 at 1:19:12–1:20:46.    Groce
waived those rights and agreed to the interview. Gov't Ex. 1 at 1:20:31; Def. Ex. 3.    He
initially denied responsibility for the robberies, and his discussion with Captain Steele
included the following exchanges:

> Steele:    What would you say if maybe some of the stuff with your initials
> on it were collected also, your DNA was collected, your
> fingerprints were collected?
>
> Groce:    Mmm, hmm.
>
> Steele:    Mr. Groce, you want to sit there and tell me you weren't there?
>
> Groce:    I wasn't there.    I need . . . I need to talk to a lawyer 'cause . . .
>
> Steele:    Then . . . then . . . then who might have been there?
>
> Groce:    I don't know 'cause I need to get me a lawyer ASAP because I
> don't know what y'all talking about.    I was sleeping at the time.
>
> Steele:    Okay.    Who has access to your car keys?

Gov't Ex. 1 at 1:27:07–1:27:39.

> Steele:    Okay, so I'm going to sit here and try to convince you that the

---

[1]  All listed times reflect the time stamp on the video recording of the interview that was admitted as
evidence during the court's evidentiary hearing.    These times have not been authenticated as accurate
and are included only for reference.

best thing for you to do is tell me who all is involved.   Maybe who borrowed your car since that is what you want me to believe, okay, which is true.   Who saw you sleeping all night at the house.

I don't even think your girlfriend was home, was she?

Groce:  Um umm . . . no, she was in Tennessee.

Steele:  Yeah, how'd I know that?

Groce:  Hmm?

Steele:  How'd I know that?

Groce:  Ummm . . .

Steele:  I know everything about you.

Groce:  I don't know 'cause y'all, y'all have ways of knowing everything.

Steele:  So do you think I'd be sitting here, spewing all this breathe at you, about all this information . . .

Groce:  Um umm . . .

Steele:  . . . and then sit here and listen to you tell me . . . you know, we've had more people call us up, "guess who was involved? This one, this one, and this one."   More people than you can . . . 'cause you know why?   What's it all about in this world today?

Groce:  Money.   Yeah.

Steele:  Yep, that's exactly right.   Everybody wanting to collect that reward money.

Groce:  Mmm, hmm . . .

Steele:  They 'gone do it.   Every one of them that called in "this name, this name, and this name" . . .

Groce:  Mmm, hmm . . .

Steele:  . . . are going to get their money.   Because they were right. When it comes time for Mr. Groce to go to court do you think

they are going to believe the videos, the fingerprints, the witnesses, the whole night?  Do you think they are going to believe that or do you think they are going to believe, "well he said he was asleep"?   I'm just being for real, Mr. Groce, okay? Now don't you think it's time to be honest with me?

Groce:    I'm being honest, but umm . . . like this right here, I do need to talk to a lawyer about that.

Steele:   Well, do you want to talk to a lawyer…

Groce:    Yeah . . .

Steele:   . . . or do you want to help me with the other people involved?

Groce:    Umm . . .

Steele:   'Cause see here's how I feel about it: you know something.

Groce:    I'm sayin', like, if . . . if I don't know if I can beat this case because I know y'all say y'all have, umm, conclusive evidence. Ain't that how you say that?

Steele:   I didn't say that.

Groce:    Umm, I'm not . . .

Steele:   What I said . . .

Groce:    I don't . . . I don't want to turn myself in for nothing that I didn't do, you hear me?   I'm telling you that.

Gov't Ex. 1 at 1:33:35–1:35:45.

Captain Steele did not stop the interview during this exchange, and he did not take any steps to provide Groce with counsel. Gov't Ex. 1 at 1:35:19.   Soon after the second exchange, Resident Agent in Charge Jennifer Conway of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") entered the interview room and again advised Groce of his *Miranda* rights. Gov't Ex. 1 at 1:36:22.   Captain Steele did not

4

communicate to Agent Conway that Groce had previously mentioned his need for a lawyer or otherwise inform her of the exchanges quoted above. *See generally* Gov't Ex. 1.   Following a second affirmative waiver of his rights, Groce admitted his involvement in the robberies and identified Defendants Martin and Carthen as his accomplices. Gov't Ex. 1 at 1:39:30−1:41:02; Def. Ex. 4.   During the interview, Groce also gave his consent for law enforcement officials to obtain a sample of his DNA (through saliva) and to search his mobile telephone.[2] Tr. at 13; Gov't Ex. 1 at 2:10:13; Def. Exs. 9−10.   The record does not indicate that Groce gave consent to the search of his vehicle.[3] Tr. at 38; *see generally* Gov't Ex. 1.

Prior to Groce's interview, anonymous tipsters had already identified him, Martin, and Carthen as the perpetrators of the robberies using a "secret witness hotline" administered by the ACSO. Tr. at 11−12.   As a result, even before Groce inculpated Martin and Carthen, Agent Conway had already planned to interview both of them once they could be located. Tr. at 12.   In the week after Groce's interview, Agent Conway interviewed Martin, who also admitted his involvement and incriminated his co-defendants, and Carthen, who invoked his right to counsel and refused to provide a statement to law enforcement. Tr. at 13−14.

## II.   Discussion

---

[2]  During the hearing, Agent Conway stated from memory that Groce consented to give a hair sample, Tr. at 13, but the word "Saliva" is circled on the consent form. Def. Ex. 9.   Regardless of the form of sample, the purpose was to obtain Groce's DNA.

[3]  Agent Conway testified that she did not recall any verbal consent to search the vehicle, but she did confirm the absence of written documentation of consent. Tr. at 38.

At the outset, the court is tasked with deciding whether Groce unequivocally invoked his right to counsel and, if so, whether his Fifth Amendment rights were violated by the continued interrogation. Doc. 54 at 6–8.   The court finds that he did, and they were.   Next, the court takes up the question of the extent to which Groce's illegally obtained confession necessitates the suppression of other evidence marshaled against him. Doc. 54 at 8–9.   Ultimately, the court finds that some evidence beyond the confession itself must be suppressed, but not the full extent of the evidence Groce asks to have thrown out.   Finally, the court considers the search of Groce's vehicle and finds that no recognized warrant exception justified its warrantless search.

## A.      Invocation of Right to Counsel

The United States Supreme Court announced in *Miranda* what has become, in the fifty years since, one of the bedrock principles of American criminal jurisprudence: that those suspected of crimes must be expressly advised of their constitutional rights—including their Fifth Amendment guarantee of counsel—prior to any custodial interview. *Miranda*, 384 U.S. at 469–76 (holding also that the right to counsel during in-custody interrogation is "indispensable to the protection of the Fifth Amendment privilege").   In addition, the right to counsel "is sufficiently important to suspects in criminal investigations . . . that it 'requir[es] the special protection of the knowing and intelligent waiver standard.'" *Davis v. United States*, 512 U.S. 452, 458 (1994) (quoting

*Edwards v. Arizona*, 451 U.S. 477, 483 (1981)).[4]   As a result, "[i]f the individual states that he wants an attorney, the interrogation must cease until an attorney is present," *Miranda*, 384 U.S. at 474, or "the suspect himself reinitiates the conversation." *Davis*, 512 U.S. at 458 (citing *Edwards*, 451 U.S. at 484–85).

Of course, there are few absolutes in law enforcement, and accused individuals may mince words or equivocate in their requests for counsel.   This is one reason the Supreme Court, in the years since *Miranda*, has carefully defined the contours of the inquiry into a suspect's invocation of his right to an attorney.   "To avoid difficulties of proof and to provide guidance to officers conducting interrogations, this is an objective inquiry." *Davis*, 512 U.S. at 458–59 (citing *Connecticut v. Barrett*, 479 U.S. 523, 529 (1987)).   Invocation of the right to counsel "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991).   Critically, "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel," the officer is not necessarily required to discontinue

---

[4] The parties agree, and the court finds, that Groce initially waived his rights and agreed to be interviewed, and that he memorialized that waiver in writing. Def. Ex. 3; *see Miranda*, 384 U.S. at 475 ("If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel."); *United States v. Beale*, 921 F.2d 1412, 1434 (11th Cir. 1991) ("Before the government may introduce a suspect's uncounselled statement made during custodial interrogation, it must show that the suspect made a voluntary, knowing and intelligent waiver of his privilege against self-incrimination and his right to counsel.").   This initial waiver, however, does not prevent him from later invoking his right to counsel. *See Davis*, 512 U.S. at 455 (considering ambiguity of invocation of right to counsel after suspect initially waived his right to counsel orally and in writing).

questioning. *Davis*, 512 U.S. at 459.   It is on this last point that the Government hangs its hat, arguing that Groce's references to an attorney were ambiguous and did not prevent further questioning. Doc. 120 at 4.   This is a fact-intensive inquiry, in which the Supreme Court has suggested that the "accused's request for counsel may be characterized as ambiguous or equivocal as a result of events preceding the request or of nuances inherent in the request itself." *Smith v. Illinois*, 469 U.S. 91, 99–100 (1984).

Ultimately, the court finds that Groce's statements, when placed in the context of the circumstances surrounding them, constituted an unequivocal invocation of his right to counsel—if not upon his first two mentions of an attorney, then at least by his third and final request for one.   Within an eight-minute period of uninterrupted questioning, Groce stated "I need to talk to a lawyer," "I need to get me a lawyer ASAP," and "I do need to talk to a lawyer about that." Gov't Ex. 1. at 1:27:07–1:35:45.   Rather than ask questions designed to clarify whether Groce truly intended to invoke his right to counsel after the first two references to an attorney, Captain Steele continued on his line of questioning about the robberies. Gov't Ex. 1 at 1:27:07–1:27:39.   On the third instance, however, Captain Steele did acknowledge the request, asking Groce, "Well, do you want to talk to a lawyer . . . or do you want to help me with the other people involved?" Gov't Ex. 1 at 1:35:20.   The court will make two observations regarding this conversation, as depicted on the interrogation video, that are not readily observable from the transcription. First, Groce emphasized the word "do" in the statement "I *do* need to talk to a lawyer." Gov't Ex. 1 at 1:35:16.   Second, not only did Groce interrupt Captain Steele with the

8

word, "yeah," after Steele said "Well, do you want to talk to a lawyer . . . ," but Groce also nodded his head affirmatively when he answered. Gov't Ex. 1 at 1:35:20.

This exchange stands in sharp contrast to the ambiguous invocation in *Davis*. There, the suspect originally waived his right to counsel but later stated, "Maybe I should talk to a lawyer." *Davis*, 512 U.S. at 455.   Immediately upon hearing this statement, the interviewing agents told the suspect "that if he wants a lawyer, then we will stop any kind of questioning with him." *Id*.   They also refused to continue until the suspect clarified whether he was "asking for a lawyer or . . . just making a comment about a lawyer." *Id*. The suspect responded, "No, I'm not asking for a lawyer," and later, "No, I don't want a lawyer." *Id*.   When, after another hour of questioning, the suspect stated, "I think I want a lawyer before I say anything else," the agents ceased all questioning of him. *Id*.   The Supreme Court held that the suspect did not unequivocally request an attorney when he stated, "Maybe I should talk to a lawyer," and praised the agents' "good police practice" in asking follow-up questions aimed "to clarify whether or not he actually wants an attorney." *Id*. at 462.

The same cannot be said of Groce's interrogation.   Even if the court were to assume that Groce's first two statements could be characterized as ambiguous "comments about a lawyer," the third was unequivocal when considered in the context of his earlier statements, his emphasis on the word "do," and his affirmative answer and head nod in response to the officer's clarifying question.   Groce's request was more definite and more forceful than the *Davis* suspect's "Maybe I should talk to a lawyer."   This is also

true of Groce's statements when compared with suspect statements found to be ambiguous in post-*Davis* Eleventh Circuit decisions. *E.g.*, *United States v. Carruthers*, 458 F. App'x 811, 819 (11th Cir. 2012) (holding that suspect's question "Do I need an attorney?" was not clear invocation of right to counsel); *United States v. Isaac*, 448 F. App'x 954, 957 (11th Cir. 2011) (holding that suspect's statement that "he would not sign any forms without speaking to his attorney" was "limited to the act of not signing the waiver form" and ambiguous with respect to invoking his right to counsel during the interview); *United States v. Propst*, 369 F. App'x 42, 46 (11th Cir. 2010) (holding that suspect's statement "I mean, I'd rather have a lawyer around to talk or, you know what I am saying, have some papers saying something, you know," immediately after his inquiry into whether officers could make a deal with him in exchange for cooperation, was ambiguous); *United States v. Tran*, 171 F. App'x 758, 761 (11th Cir. 2006) (holding that suspect's request that officer "retrieve his bankruptcy lawyer's business card" was ambiguous); *Valle v. Sec'y for Dep't of Corr.*, 459 F.3d 1206, 1215 (11th Cir. 2006) (holding that suspect's statement "that he had spoken to an attorney and that 'she had advised him not to speak to anybody or to sign anything,'" was ambiguous).

Moreover, the officer's limited follow-up questioning did nothing to divine whether Groce truly intended to invoke his right to counsel, and arguably could have been intended only to convince Groce to continue talking. *See* Gov't Ex. 1 at 1:35:20 ("[O]r do you want to help me with the other people involved? . . . 'Cause see here's how I feel about it: you know something."). The *Davis* court may have "decline[d] to adopt

a rule requiring officers to ask clarifying questions," but it also praised the use of these questions because they "help protect the rights of the suspect by ensuring that he gets an attorney if he wants one, and will minimize the chance of a confession being suppressed due to subsequent judicial second-guessing as to the meaning of the suspect's statement regarding counsel." *Id*. at 461–62. Even assuming Captain Steele was not required to clarify Groce's request, once he chose to do so it was unreasonable not to listen for Groce's answer. Any other ruling would subvert the rationale behind clarifying questions, transforming them into another tool for pressuring suspects not to invoke their rights.

Ultimately, "[t]he law in this area is clear: once an accused requests counsel, the officer cannot ask questions, discuss the case, or present the accused with possible sentences and the benefits of cooperation." *United States v. Gomez*, 927 F.2d 1530, 1539 (11th Cir. 1991) (citations omitted). This rigid rule is "designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." *Davis*, 512 U.S. at 458. The court does not find that Groce was badgered to waive his rights, but his request for an attorney was not honored. The constitutional violation in this instance may not have been as egregious as the tactics used in *United States v. Thomas*, 521 F. App'x 878 (11th Cir. 2013), when agents threatened additional felony charges as punishment for the decision that the suspect would "not talk[] without a lawyer—no way," *id*. at 880, but it is a violation nonetheless, and of a right that officers must "scrupulously honor." *James v. Arizona*, 469 U.S. 990, 992 (1984).

11

Under *Edwards*, Groce should not have been "subject to further interrogation by the authorities until counsel ha[d] been made available to him, unless [he] himself initiate[d] further communication." 451 U.S. at 484–85.   The Government has not argued that Groce reinitiated the conversation, and the interrogation video makes clear that the officer's questions continued unabated after Groce's request for an attorney. *See generally* Gov't Ex. 1.   Instead, the Government posits that when Groce said, "Umm," after the officer continued to question him, this "cast[ed] doubt on the prior affirmative." Doc. 120 at 7.   Because Groce did not reinitiate the conversation, this retroactive second-guessing runs headlong into the clear pronouncement from the Supreme Court in *Smith* that "postrequest responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself." *Smith*, 469 U.S. at 100. The same may certainly be said for Agent Conway's subsequent advisement of rights, which the Government attempts to characterize as a "clarifying" exercise. Doc. 120 at 7. The Government's claim that Agent Conway was merely seeking clarity does not square with her testimony that she had no knowledge of the earlier request for counsel. Tr. at 19. The interview should have ended before Agent Conway entered the room.   Anything Groce said and did after he requested an attorney cannot be used against him.   The exclusionary rule of *Miranda* mandates the suppression of the portion of Groce's interview that occurred after his invocation of counsel at the time 1:35:15, as indicated on the video recording. *Michigan v. Harvey*, 494 U.S. 344, 362 (1990) ("[S]tatements improperly taken after the invocation of the right to counsel . . . must be excluded from

the State's case in chief to ensure compliance with *Miranda*'s dictates.").

## B.     Fruit of the Poisonous Tree

Having found that the violation of Groce's constitutional rights necessitates the suppression of his confession, the court must now consider the extent to which this violation taints other evidence developed during the course of the law enforcement investigation.   The "fruit of the poisonous tree" doctrine "bars evidentiary 'fruit' obtained 'as a direct result' of an illegal search or an illegal coercive interrogation." *United States v. Brookins*, 614 F.2d 1037, 1041 (5th Cir. 1980) (quoting *Wong Sun v. United States*, 371 U.S. 471, 485 (1963)).   Groce argues that the following evidentiary items are fruits of his illegal interrogation:

1.     Martin's identity and confession;
2.     Carthen's identity;
3.     Groce's consent to provide his DNA through blood, saliva, or hair samples;
4.     Groce's consent to the search of his mobile telephone; and
5.     Groce's consent to the search of his 2000 Lincoln Town Car.[5]

*See* Doc. 54 at 8–9.   The court will address each item in turn.

### 1.     Co-Defendant Identities and Confession

Groce's identification of Martin and Carthen, and Martin's subsequent confession, all occurred after the violation of Groce's Fifth Amendment rights.   The critical question is thus whether one of the recognized exceptions to the exclusionary rule—inevitable discovery, attenuation, or independent source—removes the taint of the illegal search.

---

[5]  As discussed below, the record does not indicate Groce actually provided consent to a search of his vehicle.

The Government relies only on the inevitable discovery doctrine, which does apply here. The leading case on point in this circuit—or at least in its predecessor circuit—is *Brookins*, which places on the Government the burden of proving that "when the illegality occurred [the officers] possessed and were actively pursuing the evidence or leads that would have led to the discovery of the challenged witness and that there was a reasonable probability that that witness would have thereby been discovered." 614 F.2d at 1048.   In *Brookins*, an illegal interrogation resulted in the suspect's incrimination of an individual named Carlton Holt. *Id*.   Before the interview, however, the officers had already determined that someone at a house owned by an "M.D. Holt" had spoken with the suspect around the time of an automobile theft. *Id*.   Based on that call and other leads, they had already "set in motion police inquiries" into Carlton Holt's identity. *Id*. On these facts, the *Brookins* court held: "More than a reasonable probability existed that normal police investigation, if the interrogation had never occurred, would have disclosed the identity of Carlton Holt, which would have led to knowledge of his involvement in the automobile theft." *Id*.

The instant facts are even more favorable to the Government than those in *Brookins*.   More than just actively pursuing *leads* that would have identified Martin and Carthen, the ACSO and ATF were already pursuing *Martin and Carthen themselves* at the time of the illegal interview. Tr. at 12.   Anonymous tipsters had identified Martin and Carthen, and they were both in the process of being "rounded up" for questioning at the time of Groce's interview. Tr. at 12.   Agent Conway testified that the officers would

have interviewed Martin and Carthen even if Groce had not identified them. Tr. at 12. This is an even more mature investigation than the one "set in motion" in *Brookins*. Accordingly, the court finds that there was at least a reasonable probability that Martin and Carthen would have been interviewed regardless of anything Groce may have said, and thus the inevitable discovery doctrine purges the taint of Groce's illegally obtained identification. *Brookins*, 614 F.2d at 1048; *see also United States v. Drosten*, 819 F.2d 1067, 1071 (11th Cir. 1987) (finding "that the government has sufficiently established the element of 'active pursuit' under the inevitable discovery rule" where officers "possessed information relating to [the suspect's] identity and address, as well as [his] beeper number" before the illegal search).

### 2.   *Consents for DNA and Mobile Telephone Searches*

As to the next two items, Groce executed written consent forms authorizing ATF to obtain his DNA and to search his mobile phone. Def. Ex. 9–10.   He did so after his right to counsel was violated. Gov't Ex. 1. at 1:35:20 & 2:10:13.   The court conducts "two separate inquiries where a consent to search follows prior illegal activity by the police.   First, a court must determine whether the consent was voluntary.   Second, the court must determine whether the consent, even if voluntary, requires exclusion of the evidence found during the search because it was the 'fruit of the poisonous tree.'" *United States v. Delancy*, 502 F.3d 1297, 1308 (11th Cir. 2007) (citing *United States v. Santa*, 236 F.3d 662, 676–77 (11th Cir. 2000)).   The parties skip over the first step, but the "two step approach is mandatory, and the government bears the burden on both issues."

*Delancy*, 502 F.3d at 1308 (citing *United States v. Robinson*, 625 F.2d 1211, 1219 (5th Cir. 1980)).   The Government has made no attempt to carry its burden on the first step, and an independent review of the record finds insufficient evidence of voluntariness.[6] As to the second inquiry, the Government offers that the inevitable discovery exception saves these items[7] because officers could have obtained a search warrant if Groce refused to give consent. Doc. 120 at 8.   However, "[b]ecause a valid search warrant nearly always can be obtained after the search has occurred," the Eleventh Circuit has expressly rejected this argument. *United States v. Satterfield*, 743 F.2d 827, 846 (11th Cir. 1984).   Instead, officers must already be "pursuing a lawful means of discovery at the time the illegality occurred." *Id.*   To hold that a hypothetical future search warrant cures the earlier illegality "would practically destroy the requirement that a warrant . . . be obtained before the search takes place," and undermine the "constitutionally-mandated preference for substituting the judgment of a detached and neutral magistrate for that of a searching officer." *Id.*; *see also United States v. Quinney*, 583 F.3d 891, 894–95 (6th Cir. 2009) (rejecting the government's argument that the inevitable discovery doctrine cures a

---

[6]  As the Eleventh Circuit has held:

> Relevant factors in determining voluntariness, none of which is dispositive, include voluntariness of the defendant's custodial status, the presence of coercive police procedure, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence and, significantly, the defendant's belief that no incriminating evidence will be found.

*United States v. Chemaly*, 741 F.2d 1346, 1352 (11th Cir. 1984), *opinion reinstated on reh'g by United States v. Bacca-Beltran*, 764 F.2d 747 (11th Cir. 1985) (quotation marks omitted) (quoting *U.S. v. Phillips*, 664 F.2d 971, 1023–24 (5th Cir. 1981), *cert. denied*, 457 U.S. 1136 (1982)).   The record is virtually silent as to these indicia of voluntariness.

[7]  More accurately, the Government's brief advances this argument with respect to Groce's DNA sample, but does not state a basis for admitting any evidence retrieved from Groce's mobile phone. *See generally* Doc. 120.

16

Fourth Amendment violation when officers could have, but did not, obtain a search warrant before seizing the defendant's printer); *United States v. Johnson*, 22 F.3d 674, 683 (6th Cir. 1994) ("[T]o hold that simply because the police could have obtained a warrant, it was therefore inevitable that they would have done so would mean that there is inevitable discovery and no warrant requirement whenever there is probable cause."); *United States v. Allen*, 159 F.3d 832, 842 (4th Cir. 1998) ("The inevitable discovery doctrine cannot rescue evidence obtained via an unlawful search simply because probable cause existed to obtain a warrant when the government presents *no* evidence that the police would have obtained a warrant.   Any other rule would emasculate the Fourth Amendment."); *United States v. Echegoyen*, 799 F.2d 1271, 1280 n.7 (9th Cir. 1986) ("[T]o excuse the failure to obtain a warrant merely because the officers had probable cause and could have inevitably obtained a warrant would completely obviate the warrant requirement of the fourth amendment."); *United States v. Cherry*, 759 F.2d 1196, 1206 (5th Cir. 1985) (reversing denial of motion to suppress because inevitable discovery doctrine did not apply where agents "could have obtained a warrant but made no effort to do so").   The Government has not carried its burden as to either prong of the *Delancy* test, and any evidence obtained from the DNA and mobile telephone consent searches must be suppressed.[8]

### 3.    Consent for Vehicle Search

---

[8]  This recommendation has no bearing on whether the officers could now obtain a warrant to search the items currently in their possession—an issue that is not now before the court.   The court holds only that the promise of a potential future warrant for Groce's DNA and mobile telephone cannot cure the prior illegal searches.

Finally, Groce seeks to suppress any evidence obtained during the search of his Lincoln Town Car on that basis that his consent to this search was also tainted by the Fifth Amendment violation. Doc. 54 at 9.   However, Groce's counsel candidly admitted that, at the time of the Motion to Suppress, there was confusion over whether Groce actually did give his consent to the search. Doc. 54 at 9 n.27.   The court has now received evidence on the motion, and no written consent form has been made a part of the record.   Agent Conway also testified that she is unaware of any verbal or written consent to the vehicle search. Tr. at 38.   The *Delancy* analysis is inapplicable absent consent, and therefore the court need only consider whether the vehicle search fits within one of the recognized exceptions to the exclusionary rule.   The court finds that it does. ACSO impounded the vehicle when it arrested Groce, before he was improperly interrogated. Tr. at 15.   While the illegality of the vehicle search is discussed below, for present purposes the relevant facts are that the ACSO seized the vehicle with the intention of searching it, and that they did so before Groce's illegal interrogation. *See* Def. Ex. 11 at 23.   This constitutes an "ordinary investigation[] of evidence or leads already in [the officers'] possession," and thus the Government properly invoked the inevitable discovery exception. *Brookins*, 614 F.2d at 1048.   The evidence seized from Groce's vehicle is not due to be suppressed on this basis.

## C.   Warrantless Search of Groce's Vehicle

While the search of Groce's vehicle may not be fruit of the poisonous tree, it was illegal nonetheless.   At the time of Groce's arrest on July 21, 2014, ACSO deputies

seized and impounded his Lincoln Town Car from the parking lot outside his place of employment. Tr. at 32.   The following day, police searched Groce's vehicle without his consent and without a warrant, seizing several items of interest. Def. Ex. 11 at 23. Groce contends that this evidence must be suppressed because the search of his vehicle violated his Fourth Amendment right against unreasonable searches and seizures.[9]   The court agrees.

"The Supreme Court has held that searches and seizures conducted absent a search warrant granted by a judicial officer are *per se* unreasonable under the Fourth Amendment unless they fall within a limited set of well-defined exceptions." *See Katz v. United States*, 389 U.S. 347, 357 (1967).   Although there is no dispute that Groce's vehicle was impounded and searched without his consent or a warrant, *see* Doc. 120 at 9, the Government maintains that the search was constitutionally permissible pursuant to the inventory search exception to the Fourth Amendment's general prohibition against warrantless searches.[10]  Doc. 120 at 9–10.

An inventory search does not run afoul of the Fourth Amendment provided that "the search is conducted 'pursuant to explicit and comprehensive [police] procedures,'

---

[9]  Although Groce did not raise this argument in his suppression motion in the form and style required by the court's January 6, 2016 Order on Arraignment, *see* Doc. 54 at 9 n.27, the court will resolve it nonetheless, as both parties addressed the issue in their responsive briefing and during the evidentiary hearing. *See* Doc. 38 at 3 ("All grounds upon which the defendant relies must be specifically stated in the motion [to suppress] in separately numbered paragraphs in a section of the motion which is labeled 'Issues Presented.'   Grounds not stated in the 'Issues Presented' section of the motion will be deemed to have been waived. *See generally United States v. Richardson*, 764 F.2d 1514, 1526−27 (11th Cir. 1985).").

[10]  Although there are other exceptions to the Fourth Amendment's prohibition against warrantless searches, the inventory search exception is the only exception raised by the Government.   The remaining exceptions appear inapposite, but again the record is sparse.

such that officers have guidance in performing a task that is not an investigatory technique, but instead aims to protect individuals' possessions." *United States v. Jefferson*, 451 F. App'x 833, 835 (11th Cir. 2011) (quoting *United States v. Williams*, 936 F.2d 1243, 1248 (11th Cir. 1991)).  In other words, "inventory searches may not be conducted for the *primary purpose* of investigating crime" or as "a ruse for a general rummaging in order to uncover incriminating evidence." *United States v. Mitchell*, 2013 WL 3808152, at *21 (M.D. Fla. July 22, 2013) (internal quotation marks omitted).  To satisfy the inventory search exception, the government must establish that the officers had the authority to impound the defendant's vehicle and that the officers complied with departmental policy in conducting the search. *Jefferson*, 451 F. App'x at 835; *see also United States v. Glover*, 441 F. App'x 748, 752 (11th Cir. 2011) ("The government has the burden to show the requirements of an inventory search have been met.").

The Government does not carry its burden.   At the hearing, the Government did not present any evidence demonstrating that Groce's vehicle was jeopardizing public safety, impeding the efficient movement of traffic, was stolen, or presented a risk of vandalism or theft such that its impoundment was warranted. *See United States v. Foskey*, 455 F. App'x 884, 889 (11th Cir. 2012).   The Government likewise failed to offer evidence demonstrating any standardized criteria or established ACSO departmental policies for conducting inventory searches, or that the officers complied with these

policies when they impounded and searched Groce's vehicle.[11]   In fact, the ACSO Report of Investigation specifically states that the officers drove to Groce's place of employment "to take custody of the suspect's vehicle, which was used in the commission of the robbery," and that they "searched the vehicle for any useable evidence" after they impounded it. Def. Ex. 11 at 22–23.   This goes well beyond the scope of a permissible inventory search.

Because the search of Groce's vehicle was conducted without a warrant and the Government has failed to establish the applicability of the inventory search exception to the Fourth Amendment's general prohibition against warrantless searches, the search of Groce's vehicle was conducted in violation of his Fourth Amendment rights.   Any evidence obtained as a result of this search must be suppressed.

### III.   Conclusion

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that Defendant's Motion to Suppress (Doc. 54) be GRANTED in part, and DENIED in part, as follows:

1.   Defendant's Motion be GRANTED to the extent it seeks the suppression of Defendant's interview after his invocation of counsel at 1:35:15 and any evidence obtained pursuant to Defendant's consent to provide a DNA sample to law enforcement, Defendant's consent to the search of his mobile telephone, and the search of

---

[11]  The Government's reply brief, which was submitted ten days after the suppression hearing, contains just a single sentence of conclusory argument on this issue—"In the present case, officers impounded the vehicle subsequent to Groce's arrest and internal procedures." Doc. 120 at 10.   There is no further elaboration by the Government on the "internal procedures" referenced in this sentence, nor has any policy or procedure been offered as evidence.   Moreover, the Government has not produced a list of the items purportedly inventoried by the ACSO, only a list of the evidentiary items seized. *See* Def. Ex. 11 at 23.

Defendant's Lincoln Town Car; and

2.     Defendant's Motion be DENIED to the extent it seeks the suppression of the identities of co-Defendants Martin and Carthen and Martin's confession.

It is further ORDERED that the parties are DIRECTED to file any objections to this Recommendation on or before **July 15, 2016.**   Any objections filed must identify the specific findings in the Magistrate Judge's Recommendation to which the party is objecting.   Frivolous, conclusive, or general objections will not be considered by the District Court.   The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a *de novo* determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *See Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); *Stein v. Reynolds Secs., Inc.*, 667 F.2d 33 (11th Cir. 1982).

DONE this 1st day of July, 2016.

/s/ Gray M. Borden
UNITED STATES MAGISTRATE JUDGE

22